IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| Roman Moss, ) | C/A No.: 1:14-3808-JMC-SVH |
| Plaintiff, ) | |
| vs. ) | REPORT AND RECOMMENDATION |
| Savannah River Remediation, LLC, ) | |
| Defendant. ) | |

In this employment discrimination case, Roman Moss ("Plaintiff") is suing his former employer, Savannah River Remediation, LLC ("Defendant"), for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq*. ("Title VII") and 42 U.S.C. § 1981 and breach of contract.[1] [ECF No. 1]. This matter comes before the court on Defendant's motion for summary judgment filed on October 22, 2015 [ECF No. 21]. The motion having been fully briefed [ECF Nos. 25, 26], it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.). Because the motion is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends Defendant's motion for summary judgment be granted.

---

[1] Although Plaintiff indicates in the complaint that he is also suing for gender discrimination [ECF No. 1 at 1], he alleges no facts to support the cause of action.

I.    Factual Background

On September 22, 2009, Defendant entered into a project agreement ("PA") with several unions, including Laborers International Union of North America, Local 515 for work performed for the Department of Energy at the Savannah River Site ("SRS"). [ECF No. 21-2 at 9–30]. The PA provides that Defendant should notify the unions as to the number and classification of employees needed and that the unions would refer their members in a nondiscriminatory manner. *Id.* at 12. It specified that Defendant had the right to determine the competency of all employees, to determine the number of employees required, to request employees with special skills and qualifications, and to select the employees to be laid off. *Id.* Plaintiff, a Caucasian male [ECF No. 1 at 2], joined the union in the summer of 2009. Pl. Dep. 25:1–26:17.[2]  After referral by the union, Defendant hired Plaintiff as a craft laborer at SRS on May 11, 2010. Harmon Aff. ¶ 5.[3]

Procedures for Complaints

Plaintiff could neither confirm nor deny that he received Defendant's Craft Employee Handbook ("Handbook"). Pl. Dep. 102:25–103:21, 108:8–16. However, union craft steward Katherine Jones ("Ms. Jones") stated that, upon his request, she provided Plaintiff with a copy. Jones Dep. 6:16–17, 29:11–24.[4] The Handbook indicated it was not a contractual agreement between employees and Defendant. [ECF No. 21-2 at 35, 46]. It specified that the terms and conditions of employment for all craft employees were

---

[2] Plaintiff's deposition may be found at ECF No. 21-4.
[3] The affidavit of Joan Harmon ("Ms. Harmon"), Defendant's director of labor relations, may be found at ECF No. 21-2 at 1–7.
[4] Katherine Jones's deposition may be found at ECF No. 21-5.

governed by the PA. [ECF No. 21-2 at 35]. It provided that any employee who believed he was being discriminated against or harassed based on "race, color, gender, religion, national origin, age, disability, or veteran status, or sexually harassed by anyone, in the course of performing his . . . duties, should promptly discuss the matter" with his immediate supervisor and/or union representative. *Id.* at 36. It indicated that if the employee believed his supervisor was the source of the discrimination or harassment, he should "discuss the matter with the next level of management and upward, or with Labor Relations." *Id.* It further provided that "[i]f circumstances prohibit this response, or if" the employee did "not receive a satisfactory response," he should process his complaints through the grievance procedure outlined in the PA. *Id.* The PA set forth procedures to address disputes over Defendant's actions and encouraged employees represented by the unions to process their complaints through its grievance procedure. [ECF No. 21-2 at 13–14].

Evaluations of Laborers

The Handbook stated that craft journeymen and apprentices would be evaluated every six months by their foremen and general foremen under a Craft Performance Evaluation Program ("Evaluation") in five performance areas that included safety, workmanship, initiative, job skills, and productivity. Pl. Dep. 109:2–123; [ECF No. 21-2 at 38]. The lead general foreman compiled the craft employees' Evaluation scores, after receiving scores for every employee on each foreman's crew. Rouse Aff. ¶ 9.[5] Employees' scores were entered into a computer system and employees were ranked

---

[5] The affidavit of Walter Rouse ("Mr. Rouse"), Defendant's laborer lead general foreman, may be found at ECF No. 21-3.

3

based on their average Evaluation scores, with a lower score being better than a higher score. *Id.* at ¶ 10. The lead general foreman could lower scores to improve performance for individual employees based on his observations of the employees' performance, but could not raise scores to indicate poorer performance than that assessed by the employee's crew foreman. *Id.* at ¶ 9. The lead general foreman then submitted the Evaluation scores directly to Defendant's labor relations department. Harmon Aff. ¶ 15. The Evaluation scores were kept confidential and neither the foremen nor the employees had access to them after they were submitted to labor relations department. *Id.* at ¶ 15; Rouse Aff. ¶ 10. Employees were selected for layoff based on their Evaluation scores. Pl. Dep. at 110:25–111:7; Harmon Aff. ¶ 14; [ECF No. 21-2 at 38]. When a site supervisor determined that the number of craft employees exceeded the current workload, he or she sent a request for a layoff to Defendant's labor relations department and indicated how many employees were to be laid off. Harmon Aff. ¶ 16. Ms. Harmon, as manager of Defendant's labor relations department, then selected the employees with the highest Evaluation scores to be laid off. *Id.*

Plaintiff's Employment

Plaintiff was supervised by foreman Stevie Cartledge ("Mr. Cartledge") from May 26, 2010, to June 20, 2010; foreman Robbie Wilkerson ("Mr. Wilkerson") from June 27, 2010, to October 10, 2010; foreman Vivian Bennett ("Ms. Bennett") from October 17, 2010, to September 25, 2011; foreman Thaddeus Sands ("Mr. Sands") for a week-and-a-half; foreman Carlton Burke ("Mr. Burke") for approximately two months; and foreman Gregory Bates ("Mr. Bates") for approximately a year. *Id.* at ¶ 6; Pl. Dep. 49:12–23,

4

50:15–18, 96:17–98:17. Plaintiff was also supervised by general foremen Mr. Rouse and Harry Anderson ("Mr. Anderson"). Pl. Dep. 36:15–18; Rouse Aff. ¶ 4. Plaintiff was the only Caucasian employee on Defendant's labor crews. Shaw Dep. 25:19–22.[6]

Plaintiff alleges he was treated unfairly by his coworkers and foremen for his entire employment with Defendant. Pl. Dep. 132:5–12. Plaintiff testified that he was forced to work alone, was given heavy workloads, and was frequently moved from one crew to another. Pl. Dep. 50:9–51:4, 131:18–25. Plaintiff stated he informed his foremen that he was being mistreated by other employees, but that made the problem worse. Pl. Dep. 54:12–19. Plaintiff alleges Mr. Cartledge instructed him to keep his mouth shut about complaints regarding workloads, working in isolation, and general mistreatment by foremen and coworkers. Pl. Dep. 131:2–132:8. He indicated Mr. Wilkerson told him to keep his mouth shut and to stop talking to his union steward. Pl. Dep. 133:25–134:21.

Plaintiff believed the alleged mistreatment was because of his race, but there is no evidence that he made a complaint of racial discrimination or filed a grievance. Although Plaintiff complained to Ms. Jones that he felt he was being treated poorly because of his race, he instructed her not to say anything to his supervisors. Jones Dep. 17:3–18:6. Plaintiff never met with Ms. Jones or his foremen to discuss any complaints of discrimination. Pl. Dep. 55:5–9; Jones Dep. 18:6–19:6. Plaintiff also alleges that he was dating the daughter of a fellow laborer, Cokey Coleman, who was African-American and did not approve of the relationship. Pl. Dep. 62:17-63:22. Plaintiff claims he was informed that Mr. Coleman was friends with Mr. Cartledge. *Id*. Though he no longer

---

[6] The deposition of Marvin Shaw ("Mr. Shaw"), Plaintiff's former coworker, may be found at ECF No. 21-6.

worked for Mr. Cartledge, Plaintiff alleges Mr. Cartledge threatened him and told him he "was just a worthless cracker, Gumby." Pl. Dep. 134:5-19. Mr. Shaw, who worked with Plaintiff on crews led by Mr. Cartledge and Mr. Wilkerson, testified that Mr. Cartledge had asked "[w]hy did they send us a white boy?" after Plaintiff was hired. Shaw Dep. 14:1–13, 19:16–20:6, 43:11–15.

Plaintiff's Complaints to Ms. Harmon

Plaintiff indicated he only made a written complaint about a problem with overtime pay. Pl. Dep. 42:3–43:1. In July 2010, Plaintiff, Ms. Jones, and Ms. Harmon met to discuss overtime work for which he had received no compensation. Harmon Aff. ¶¶ 2, 7; Jones Dep. 20:24–23:18. Plaintiff he had worked overtime to repair a busted water line at the direction of Ms. Bennett, but Mr. Cartledge, who was then Plaintiff's supervisor, had denied his request for overtime pay. Harmon Aff. ¶ 7. Ms. Harmon subsequently confirmed with Ms. Bennett that Plaintiff had worked overtime, conveyed that information to Mr. Cartledge, who was under the impression that Plaintiff had left for the day, and arranged for Plaintiff to be paid for the period. Harmon Aff. ¶ 8; Pl. Dep. 45:25–46:3. Plaintiff stated he also verbally informed Ms. Harmon that he had been treated badly, verbally abused, given heavy workloads, and made to work by himself. Pl. Dep. 46:3–21. Ms. Jones indicated Plaintiff complained about his pay and being moved to different crews, but did not mention being mistreated or discriminated against on account of his race. Jones Dep. 26:1–14. Ms. Harmon confirmed that Plaintiff stated that he had a conflict with Mr. Coleman because he was dating Mr. Coleman's daughter. Harmon Aff. ¶ 9. She also acknowledged that Plaintiff complained about being moved

6

around from area to area and from crew to crew. Harmon Aff. ¶ 10. Plaintiff indicated Ms. Harmon took notes and said she would be in contact, but did not subsequently contact him. Pl. Dep. 47:7–15. He stated he was transferred twice after their meeting. Pl. Dep. 47:15–17. Ms. Harmon indicated she spoke with Mr. Rouse after her meeting with Plaintiff and requested that Plaintiff not work around Mr. Coleman. Harmon Aff. ¶ 9. She indicated she informed Plaintiff that it was necessary to move some employees frequently because of the work that needed to be done at the time. Harmon Aff. ¶ 10. She denied that Plaintiff complained to her of any problems with harassment, race discrimination, or retaliation during the July 2010 meeting or at any time prior to his filing of the claim with the Equal Employment Opportunity Commission. Harmon Aff. ¶ 11.

Plaintiff again met with Ms. Jones and Ms. Harmon in February 2011 and complained that he was being moved from crew to crew and forced to work without a partner to fill ice water buckets. Harmon Aff. ¶ 12; Jones Dep. 25:17–26:14. Ms. Harmon stated that Mr. Bates had informed her that Plaintiff had requested to work alone. Harmon Aff. ¶ 12. She indicated she followed up with Ms. Jones and informed her that Plaintiff had requested to work alone and that there was no policy prohibiting him from doing so. *Id.*

Plaintiff's Discharge

In July 2012, Plaintiff and two African-American employees, Fitzgerald Wright ("Mr. Wright") and Jerry Green ("Mr. Green"), were selected for layoff based on a reduction in force ("RIF"). Pl. Dep. 110:25–112:5; Harmon Aff. ¶ 17; [ECF No. 21-2 at 48]. The three were selected based on their Evaluation scores. Pl. Dep. 110:25–112:5;

Harmon Aff. ¶ 13, 17; [ECF No. 21-2 at 48]. Plaintiff's averaged Evaluation score was 13.30. Harmon Aff. ¶ 17. Mr. Wright's average Evaluation score was 13.40, and Mr. Green's averaged Evaluation score was 13.20. *Id.* Twenty-eight African-American employees were laid off based on their average Evaluation scores between Plaintiff's date of hire and date he was laid off. Pl. Dep. 112:11–119:21; Harmon Aff. ¶ 18.

Plaintiff alleges that on July 26, 2012, Mr. Anderson informed him that they "were finally getting rid of" him and that he should get his stuff and leave. Pl. Dep. 122:13–15. Plaintiff stated that while he was cleaning out his locker, Mr. Anderson came in the men's locker room, laughed at him, and said "they were finally getting rid of" his "white ass" and that he should have "nothing to worry about because" he was white and had money. Pl. Dep. 123:17–24; Jones Dep. 33:7–25. Plaintiff indicated he walked to the gate and Mr. Rouse threw his paycheck out of a truck window and drove off. Pl. Dep. 123:25–124:8; Jones Dep. 34:4–8. Plaintiff contacted Ms. Jones to inform her that he was being laid off. Pl. Dep. 30:6–7; Jones Dep. 32:16–22. Ms. Jones instructed Plaintiff that he had three days to file a grievance at his union hall. Pl. Dep. 31:4–32:3. Plaintiff stated he then reported to Georgia Peterson ("Ms. Peterson") to be processed out. Pl. Dep. 124:24–25. He completed an exit interview form and did not indicate on the form that he had been harassed or discriminated against. Pl. Dep. 127:11–128:25.

The following Monday, Plaintiff reported to the union hall to meet with Mr. Dunn. Pl. Dep. 32:10–11; Jones Dep. 11:3–4, 35:16–36:5. Mr. Dunn instructed Plaintiff to type up a list of the people that he wanted to file grievances against and to write a brief summary of what each had done to harass him. Pl. Dep. 32:16–23. Plaintiff included the

8

names of Mr. Cartledge, Roosevelt Habersham ("Mr. Habersham"), Mr. Wilkerson, Ms. Bennett, Jerry Key, Mr. Bates, Mr. Anderson, Mr. Rouse, and Ms. Harmon. Pl. Dep. 144:4–147:14. He indicated Mr. Habersham used the phrase, "[i]f you want to keep your job white boy," but made no specific claims of racial discrimination against any of the other individuals he named. Pl. Dep. 144:4–148:10. Mr. Dunn indicated he would rewrite Plaintiff's complaint on the union grievance form, arrange a meeting with the individuals Plaintiff cited in the grievance, and get back to Plaintiff regarding the meeting. Pl. Dep. 32:24–33:6. After Mr. Dunn filed the grievance, Ms. Jones met with Ms. Bennett, Mr. Rouse, Mr. Cartledge, Mr. Bates, Mr. Anderson, and Mr. Wilkerson regarding the grievance. Jones Dep. 36:6–37:1.

As a result of an increased workload, on August 20, 2012, Defendant requested three additional laborers from the union. Harmon Aff. ¶ 19. The union referred Mr. Moss, Mr. Wright, and Mr. Greene back to Defendant. *Id.* Mr. Dunn contacted Plaintiff to inform him that he could return to work for Defendant. Pl. Dep. 35:4–17. Plaintiff told Mr. Dunn that he wanted to work, but that he was unwilling to work for Defendant. Pl. Dep. 34:13–35:4.

Ms. Peterson subsequently contacted Plaintiff to request that he return to work for Defendant. Pl. Dep. 35:22–36:6. Plaintiff told Ms. Peterson that he was out of town and would return the next week. Pl. Dep. 38:6–17. He also spoke with Ms. Jones and indicated to her that he would be returning after he attended to a personal matter. Jones Dep. 38:9–15. Plaintiff indicated he received calls from Mr. Rouse and Mr. Wright, who threatened him not to return to work. Pl. Dep. 36:11–24. When Ms. Peterson contacted

9

Plaintiff again, he informed her that he was still out of town, but would return. Pl. Dep. 38:23–39:3. Ms. Peterson made an appointment for Plaintiff to return in September. Pl. Dep. 39:4–7. Plaintiff spoke to Ms. Peterson after he missed his third appointment to return to work and informed her that he was meeting with a lawyer at that time to discuss the harassment that occurred on the job and that he refused to return to work for Defendant. Pl. Dep. 39:8–19.

II.     Discussion

   A.     Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-

moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

B.   Analysis

A plaintiff may prove race discrimination through direct and indirect evidence or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Price v. Thompson,* 380 F.3d 209, 212 (4th Cir. 2004). The Fourth Circuit has referred to these two avenues of proof as the mixed motive framework and the pretext framework, respectively. *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc). It is left to the plaintiff's discretion whether to proceed using the mixed motive or pretext framework. *Diamond v. Colonial Life & Accident Ins. Co.,* 416 F.3d 310, 318 n. 4 (4th Cir. 2005) ("In the event that a plaintiff has direct evidence of discrimination or simply prefers to proceed without the benefit of the burden-shifting framework, she is under no obligation to make out a prima facie case.").

1.   Discriminatory Discharge

To establish a prima facie case of discrimination under Title VII in a RIF context, a plaintiff must show that: (1) he was protected under Title VII; (2) he was selected from a larger group of candidates; (3) he was performing his job duties at a level substantially equivalent to the lowest level of that in the group retained; and (4) the process of selection produced a residual workforce that contained some unprotected persons who

11

were performing at a level lower than that at which the plaintiff was performing.[7] *Govan v. Caterpillar, Inc.*, 899 F. Supp. 2d 445, 452 (D.S.C. 2012) (citing *Corti v. Storage Tech. Corp.*, 304 F.3d 336, 340 n. 6 (4th Cir. 2002). Pursuant to this burden-shifting framework, once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Id.* (citing *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010)).

Once Defendant meets its burden of production by producing a legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination *vel non.*" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citing *Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. *Reeves*, 530 U.S. at 143. Throughout the burden-shifting scheme set forth in *McDonnell Douglas*, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff.

Here, Plaintiff cannot prove the third and fourth elements of a prima facie case. He testified that he did not know of anyone who was retained whose performance was worse or who had a worse Evaluation score than Plaintiff. Pl. Dep. 121:7–10; 151:20–25. Plaintiff has not provided any evidence showing that he was performing at a level

---

[7] Although Plaintiff states that "Defendant correctly recites the legal standard for discriminatory termination claims," he uses a different variation of the *McDonnell Douglas* framework. [ECF No. 25 at 5]. Because Plaintiff has not disputed that he was discharged pursuant to a RIF, the undersigned proceeds under the RIF context.

substantially equivalent to the lowest level of the group retained or that the RIF produced a residual workforce containing unprotected persons performing at a level lower than Plaintiff. Therefore, the undersigned recommends that Defendant be granted summary judgment on Plaintiff's discriminatory discharge claim.

Even if Plaintiff were to establish a prima facie case, Defendant has provided a legitimate, nondiscriminatory reason for discharging him—his Evaluation score placed him in the bottom three scores. Therefore, the burden shifts back to Plaintiff to prove by a preponderance of the evidence that the Evaluation score was simply pretext for illegal discrimination. Plaintiff has not met this burden. Plaintiff has produced evidence showing that Mr. Cartledge made discriminatory comments to him. However, Mr. Cartledge ceased being Plaintiff's supervisor a month after Plaintiff started. Plaintiff testified that Mr. Cartledge continued to make threatening comments, but has provided no evidence that Mr. Cartledge contributed to his Evaluation score after June 2010. The remainder of Plaintiff's complaints are general claims of mistreatment that appear to span the entirety of Plaintiff's employment. However, also during the span of Plaintiff's employment, 28 African-American coworkers were laid off while Plaintiff was retained. Plaintiff provides no evidence of anything that changed around June 2012 that would have caused Defendant to create a pretextual basis for discharging him, when it had not done so before. Therefore, the undersigned recommends Defendant be granted summary judgment on Plaintiff's discriminatory discharge claim.

### 2. Retaliation

To prevail under the *McDonnell Douglas* framework for a retaliation claim, Plaintiff must first establish a prima facie case by showing: (1) that he engaged in protected activity, (2) that his employer took adverse action against him, and (3) that a causal relationship existed between the protected activity and the adverse employment activity. *Price*, 380 F.3d at 212. The burden then shifts to Defendant to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc). If Defendant makes this showing, the burden shifts back to Plaintiff to rebut Defendant's evidence by demonstrating that its purported non-retaliatory reasons "were not its true reasons, but were a pretext for discrimination." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, (2000)).

Plaintiff vaguely argues that "the retaliation by the Defendant against the Plaintiff began following the Plaintiff's complaints about the discrimination." [ECF No. 25 at 8]. Plaintiff testified that he complained to his foreman about the way he was treated, but does not specify that he complained he was being discriminated against based on his race. Pl. Dep. 54:8–19. "[A] general complaint of unfair treatment does not translate into a charge of illegal . . . discrimination." *McNair v. Computer Data Sys., Inc.*, 172 F.3d 863 (Table), 1999 WL 30959, *5 (4th Cir. 1999) (quoting *Barber v. CSX Distribution Servs.,* 68 F.3d 694, 702 (3rd Cir. 1995)) (holding that protected activity for purposes of identical anti-retaliation provision of ADEA requires specific allegation of unlawful age discrimination). Ms. Jones testified that Plaintiff often complained about mistreatment

14

and sometimes mentioned it was because he was white, but he refused to allow her to address it, so she never discussed it with his foreman. Jones Dep. 17:3–19:10.

Assuming without deciding that Plaintiff's vague conversations with Ms. Jones constitute protected activity, he cannot make a prima facie case because there is no causal connection between his discharge and the protected activity. Plaintiff has provided no evidence suggesting that the decision makers in this case, the foremen that contributed to his Evaluation scores, had any knowledge of his protected activity. *See Shun-Lung Chao v. International Buisness Machines Corp.*, 424 F. App'x 259, 261 (4th Cir. 2011) ("There is nothing in the record to suggest that Chao's manager, who ultimately made the decision to terminate him . . . , actually knew of Chao's protected activities at the time she made her decision. Absent such a showing, we cannot say that he has made out a prima facie case."); *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case."). Therefore, the undersigned recommends Defendant be granted summary judgment on Plaintiff's retaliation claim.

### 3. Claims pursuant to 28 U.S.C. § 1981

Section 1981 provides that "[a]ll persons . . . have the same rights . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Making and enforcing contracts includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the

15

contractual relationship." 42 U.S.C. § 1981(b). Therefore, to pursue a claim under § 1981, Plaintiff must prove that Defendants "intended to discriminate [against him] on the basis of race, and that the discrimination interfered with a contractual interest." *Denny v. Elizabeth Arden Salons, Inc*., 456 F.3d 427, 434 (4th Cir. 2006). Section 1981 claims are subject to the same analysis as the Title VII claims. *Thompson v. Potomac Electric Power Co.*, 312 F.3d 645, 649, n. 1 (4th Cir. 2002) (analysis of § 1981 claim the same as Title VII); *see also Howard v. Lakeshore Equipment Co.*, 482 F. App'x 809, 810 (4th Cir. 2012) (applying *McDonnel Douglas* approach to § 1981 claims).

For the reasons discussed above witrh regard to Plaintiff's Title VII claims, the undersigned recommends Defendant be granted summary judgment on Plaintiff claims brought pursuant 42 U.S.C. § 1981.

### 4. Hostile Work Environment

Plaintiff failed to address Defendant's arguments regarding a hostile work environment claim other than the statement "[o]nce [Plaintiff] made the complaints, the Defendant created a hostile work environment." [ECF No. 25 at 8]. In addition, the majority of the statements contained in Plaintiff's factual recitation that might be relevant to his hostile work environment claim do not have a citation and cannot be found in the record before the court. Because Plaintiff has failed to show that Defendant subjected him to conduct that was so severe and pervasive to alter the conditions of his employment, the undersigned recommends Defendant be granted summary judgment on Plaintiff's hostile work environment claim.

### 5. Breach of Contract

Plaintiff has not disputed any of Defendant's arguments regarding Plaintiff's breach of contract claim. Therefore, the undersigned recommends Defendant be granted summary judgment on Plaintiff's breach of contract claim.

III.     Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Defendant's motion for summary judgment be granted.

IT IS SO RECOMMENDED.

June 27, 2016                                              Shiva V. Hodges
Columbia, South Carolina                          United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).